**State of Minnesota**

| | |
|---|---|
| COUNTY OF RAMSEY | |

**District Court**

| | |
|---|---|
| Judicial District: | SECOND |
| Court File Number: | |
| Case Type: | OTHER CIVIL |

CASEY KONO, DAVID VELASQUEZ, JONATHAN GRIFFITH, LILIBETH GONZALEZ, DANIEL HOLT, HYUN HAN, FRANKLIN MORLEY, MATTHEW HERBERT, BRANTLEY T JOHNSON,STEVEN BAKER ,MELANIE ROMERO, KENNETH BETHARD, THOMAS EDWARDS, VICENTE ORTIZ, CONNER PRICE, QUEENA PETERS, JOSE HERNANDEZ CONTRERAS, MICHAEL FLETCHER, CLINTON CAUDILL, MARK GOYA, RICARDO FRANCIS, FRANCISCO VENEGAS, CORNELL BAPTISTE, LUKE LUNSFORD, CHARLES PRESTON, RUBEN REYES, GERALD CHAMBERS, COLIN CHRISTNER, MET DEMA, ERIC FLOREK, LLOYD D JONES, MICHAEL LOWMAN, ROBERT SIMPSON, DOUGLAS WALDROP, JONATHON WINGETT, MENELIK LEMONS, ERNESTO CABRERA, CURTIS MCALLISTER, ALEXANDER LAERTES GORAM, CURTIS ANDERSON, MALCOM MOSES, BRUCE BOLYARD, MARCUS HEWETT, CHRISTOPHER CAUDILL, FRANK DICKINSON, ROBERT CARL MONCRIEF, PATRICK JASON ANTHONY, WILLIE A. MEARIS, CHRISTOPHER HICKS, MARK MANEVAL, ANGELA EWEN, RAYMUNDO GARZA, JASON HAWKINS, LORI TAYLOR, GREG CARDENAS JR., RANDY HOLMES, ANDREW JONES, ALAN ADKINS, TIM AUTY, RICHARD

**Civil Summons**

WOODFORK, ROSA BORJA,
DARIO FLORES, DAVID
WILLIAMS, MICHAEL WILLIAMS,
MATTHEW BRATTON, GREGORY
BUSBY, JOSE GUADALUPE
GARZA, WESLEY BENJAMIN,
KENNETH LAW, DEMETRIUS
O'HALLORAN, JESUS LOPEZ,
ANDREW FIELD, MICHAEL
PERALTA, MICHAEL SCOTT
MCCONNELL, REBECCA KING
KUSCHKA, MICHAEL
SLOWINSKI, TAYLOR COBB,
RICARDO SHIVER, BRANDON
TURNER, DUSTY MAYES, PAUL
MORROW, JOSEPH L TUCKER,
EVERETT DILLIE, KRISTOPHER
SCOTT BAUER, BRANDON
PARKER, COTY BOWSER, JOHN
DEBERARD, MATTHEW
JOHNSON, TIMOTHY LITTLES,
RODNEY MADKINS, JERALD
FIGHT, RHONJEAN GORDON
DAVIS, LARRY IRWIN, AUSTIN
HENDERSON, STANLEY RAY,
PAULA ROBINSON, CLEMENTE
AYMAT-FIGUEROA, DAVID
HAMILTON and JEFFREY HANKE

Plaintiffs,

vs

3M COMPANY.

Defendant.

This Summons is directed to 3M Company:

1.    **You are being sued.** The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.     **You must BOTH reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called service. You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at www.mncourts.gov/forms under the "Civil" category. The instructions will explain in detail how to fill out the *Answer* form.

3.     **You must respond to each claim.** The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.     SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the *Complaint*.

To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

_____

5.     Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.     **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**

7.   **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.


January 25, 2023
Date

/s/ Jason B. Wolf
Signature

Jason B. Wolf, Minnesota Lawyer ID. 0388737
**PARAFINCZUK WOLF, P.A.**
5550 Glades Road, Suite 500
Boca Raton, FL 33431
Telephone: (954) 462-6700
Fax: (954) 462-6567
jwolf@parawolf.com

Attorneys for Plaintiffs

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Case Type: Other Civil

Judge_____

Court File No. _____

**COMPLAINT**

CASEY KONO, DAVID VELASQUEZ, JONATHAN GRIFFITH, LILIBETH GONZALEZ, DANIEL HOLT, HYUN HAN, FRANKLIN MORLEY, MATTHEW HERBERT, BRANTLEY T JOHNSON,STEVEN BAKER ,MELANIE ROMERO, KENNETH BETHARD, THOMAS EDWARDS, VICENTE ORTIZ, CONNER PRICE, QUEENA PETERS, JOSE HERNANDEZ CONTRERAS, MICHAEL FLETCHER, CLINTON CAUDILL, MARK GOYA, RICARDO FRANCIS, FRANCISCO VENEGAS, CORNELL BAPTISTE, LUKE LUNSFORD, CHARLES PRESTON, RUBEN REYES, GERALD CHAMBERS, COLIN CHRISTNER, MET DEMA, ERIC FLOREK, LLOYD D JONES, MICHAEL LOWMAN, ROBERT SIMPSON, DOUGLAS WALDROP, JONATHON WINGETT, MENELIK LEMONS, ERNESTO CABRERA, CURTIS MCALLISTER, ALEXANDER LAERTES GORAM, CURTIS ANDERSON, MALCOM MOSES, BRUCE BOLYARD, MARCUS HEWETT, CHRISTOPHER CAUDILL, FRANK DICKINSON, ROBERT CARL MONCRIEF, PATRICK JASON ANTHONY, WILLIE A. MEARIS, CHRISTOPHER HICKS, MARK MANEVAL, ANGELA EWEN, RAYMUNDO GARZA, JASON HAWKINS, LORI TAYLOR, GREG CARDENAS JR., RANDY HOLMES, ANDREW JONES, ALAN ADKINS, TIM AUTY, RICHARD WOODFORK, ROSA BORJA, DARIO FLORES, DAVID WILLIAMS, MICHAEL WILLIAMS, MATTHEW BRATTON, GREGORY

BUSBY, JOSE GUADALUPE GARZA,
WESLEY BENJAMIN, KENNETH LAW,
DEMETRIUS O'HALLORAN, JESUS
LOPEZ, ANDREW FIELD, MICHAEL
PERALTA, MICHAEL SCOTT
MCCONNELL, REBECCA KING
KUSCHKA, MICHAEL SLOWINSKI,
TAYLOR COBB, RICARDO SHIVER,
BRANDON TURNER, DUSTY MAYES,
PAUL MORROW, JOSEPH L TUCKER,
EVERETT DILLIE, KRISTOPHER
SCOTT BAUER, BRANDON PARKER,
COTY BOWSER, JOHN DEBERARD,
MATTHEW JOHNSON, TIMOTHY
LITTLES, RODNEY MADKINS,
JERALD FIGHT, RHONJEAN GORDON
DAVIS, LARRY IRWIN, AUSTIN
HENDERSON, STANLEY RAY, PAULA
ROBINSON, CLEMENTE AYMAT-
FIGUEROA, DAVID HAMILTON and
JEFFREY HANKE,

    Plaintiffs,

V.

3M COMPANY,

    Defendant.

COMES NOW, the above captioned Plaintiffs, by and through the undersigned counsel, and for their Complaint against Defendant 3M Company for personal injuries and sequelae thereto sustained from Defendant's unreasonably dangerous product, the dual-ended Combat Arms™ earplug (Version 2 CAEv.2) ("Dual-Ended Combat Arms Earplug"), state as follows:

## INTRODUCTION

1.    Each Plaintiff submits this Complaint to recover damages arising from hearing-related injuries and sequelae thereto caused by the Dual-Ended Combat Arms Earplug.

2.    Plaintiffs used Defendant's dangerously defective Dual-Ended Combat Arms

Earplug in myriad contexts, including during their military service, which included, among other things, firearms training, vehicle use and maintenance, non-combat related work in noise-hazardous conditions, and/or active military duty domestically and/or abroad.

3. Defendant was aware of the defects and risks of the Dual-Ended Combat Arms Earplug but nonetheless supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks.

4. The defective design of the Dual-Ended Combat Arms Earplug prevented Plaintiffs from obtaining a proper fit and seal when inserting the device into their ear canals.

5. The defective design of the Dual-Ended Combat Arms Earplug also caused the device to loosen imperceptibly in Plaintiffs' ear canals.

6. As a result of the dangerously defective design of the Dual-Ended Combat Arms Earplug, the device did not remain sealed to Plaintiffs' ear canals and thus allowed damaging sounds to enter Plaintiffs' ear canals, unbeknownst to Plaintiffs and the United States military.

7. Defendant failed to warn or instruct Plaintiffs or the United States military of the defects and risks related to the Dual-Ended Combat Arms Earplug.

8. Use of Defendant's Dual-Ended Combat Arms Earplug has caused Plaintiffs to suffer hearing loss, tinnitus, and/or additional hearing-related injuries.

9. Defendant provided the Dual-Ended Combat Arms Earplug to Plaintiffs and/or the United States military between approximately 2003 and 2015.

10. Defendant's Dual-Ended Combat Arms Earplug has caused the Plaintiffs to suffer hearing loss, tinnitus, and/or additional hearing-related injuries, including but not limited to pain, suffering, and loss of fundamental life pleasures.

**PARTIES**

11. Each Plaintiff in these individual actions is a citizen and/or resident of the United States who has suffered hearing-related injuries and sequelae thereto as a result of using Defendant's dangerously defective Dual-Ended Combat Arms Earplug.

12. Plaintiffs bring these actions in this Complaint pursuant to Minn. R. Civ. P. 20.01.

13. Where applicable and/or necessary, this Complaint is also filed on behalf of each Plaintiff's spouses or decedents.

14. Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business in Minnesota. Defendant 3M has a dominant market share in virtually every safety product market, including hearing protection devices. Defendant 3M is one of the largest companies in the United States.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to Minn. Const., Art. VI, § 3 and *Daimler AG v. Bauman*, 571 U.S. 117 (2014).

16. Venue is proper in this district under Minn. Stat. Ann. § 542.09.

## FACTUAL ALLEGATIONS

### Defendant's Creation of the Dual-Ended Combat Arms Earplug

17. The Dual-Ended Combat Arms Earplug is a one-sized, dual-ended, triple-flanged earplug that Defendant[1] created, manufactured, constructed, assembled, designed, tested, promoted, advertised, marketed, distributed, and/or sold to civilians and the United States military from approximately 2003 to 2015.

18. Each end of the Dual-Ended Combat Arms Earplug incorporates a single-ended,

---

[1] Aearo Technologies was the global market leader in hearing and eye protection and was based in Indianapolis, Indiana. Aearo Technologies developed, marketed, and sold the Combat Arms™ earplug until being acquired by 3M in 2008 for $1.2 billion. Afterwards, 3M hired Aearo's employees and maintains it as a separate operating unit. Post-acquisition, the Combat Arms™ earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably. Aearo is not a named defendant in this case.

triple-flanged earplug called the Ultrafit, which Defendant also designed.



19.    Defendant patented this "multi-flanged earplug" design on September 19, 1989, as set forth in further detail in U.S. Patent No. 4,867,149.

20.    Although both ends of the Dual-Ended Combat Arms Earplug use the same Ultrafit earplug, Defendant designed each end to serve a different purpose.

21.    Defendant designed the olive-colored end of the Dual-Ended Combat Arms Earplug to block as much sound as possible, just like the single-ended Ultrafit earplug initially designed by Defendant.

22.    Defendant referred to the olive-colored end of the Dual-Ended Combat Arms Earplug as the "closed," "blocked," or "linear" end.

23.    Unlike the olive-colored end, the yellow-colored end of the Dual-Ended Combat Arms Earplug is attached to a non-linear filter, which provides level-dependent hearing protection so that users can hear low-level sounds (*e.g.*, close-range conversation), while also blocking loud impulse sounds (*e.g.*, noises from industrial machines).

24.    Defendant referred to the yellow-colored end of the Dual-Ended Combat Arms Earplug as the "open," "unblocked," or "non-linear" end.

25.    Drs. Pascal Hamery and Armand Dancer from the French-German Institute of Saint Louis ("ISL") designed and patented the non-linear filter in 2000.

26. According to U.S. Patent No. 6,068,079, ISL's non-linear filter uses a "simple design permitting improved filtering performance."

27. The filter is "placeable in the external auditory canal of a user by means of an earplug" and may be used "in a military or industrial environment," providing protection from "noise from firearms of all calibers or from industrial machines, such as metallurgical presses."

28. Dr. Hamery of ISL also designed and patented the "double-ended" design of the Dual-Ended Combat Arms Earplug in 2000.

29. According to U.S. Patent No. 6,070,693, ISL's "double-ended" earplug "can function either in a selective attenuation mode or a maximum attenuation mode," allowing users to "choose between two operating modes of attenuation."

30. ISL's patent of the "double-ended" design makes clear that "[t]he hearing protector is intended to be sealingly inserted into the auditory canal of the user."

31. Thus, in addition to designing, developing, and patenting the non-linear filter used in the Dual-Ended Combat Arms Earplug, Dr. Hamery also designed and patented the "double-ended" design of the Dual-Ended Combat Arms Earplug.

32. Defendant subsequently purchased both patents from ISL and/or obtained an exclusive license from ISL to use both patents in the Dual-Ended Combat Arms Earplug.

33. Defendant created the Dual-Ended Combat Arms Earplug by inserting ISL's non-linear filter into a channel connecting two triple-flanged Ultrafit earplugs, resulting in a single "double-ended" earplug intended for linear and non-linear attenuation as covered by U.S. Patent Nos. 4,867,149; 6,068,079; and 6,070,693.

34. On October 7, 2015, Jeff Hamer of 3M testified that Defendant's Dual-Ended Combat Arms Earplug uses the "same basic notion of taking a plug, like the Ultrafit plug, forming it with a channel in it, and then putting [the ISL] filter in it."

35.    Likewise, on April 24, 2013, Doug Ohlin of 3M testified that "all [Defendant] had to do was insert the [ISL] filter" into Defendant's preexisting design of the triple-flanged Ultrafit earplug because "the hole was already there."

36.    The Ultrafit earplug already contained a small hole in its channel for a "music filter."

37.    Mr. Ohlin testified that the United States military purchased the Dual-Ended Combat Arms Earplug without providing any product "specifications" whatsoever because Defendant developed a technologically simple earplug that was "ready to go" prior to the military's interest in the product.

38.    Thus, in the words of Defendant's own internal documents, "3M is the creator" of the Dual-Ended Combat Arms Earplug.

### Civilian and Military Use

39.    Given the preexisting design of the Dual-Ended Combat Arms Earplug, which supposedly offered a "low tech" solution for protecting users from harmful noises, the United States military assigned the Dual-Ended Combat Arms Earplug a national stock number and began purchasing the device in approximately 2003, after the product had already entered the commercial market.

40.    Defendant directly and/or indirectly supplied the Dual-Ended Combat Arms Earplug to military personnel and civilians, including Plaintiffs, from at least 2003 to 2015, regardless of wartime, combat, and/or military-related exigencies.

41.    Bryan McGinley, who testified as 3M's corporate representative on April 3, 2013, asserted that "we don't differentiate between [private sector companies and governmental entities] with any of our products."

42.    Likewise, Elliott Berger, the Division Scientist of 3M's Personal Safety Division, testified on October 8, 2015, that the Dual-Ended Combat Arms Earplug is "sold in markets other

than just the military."

43.    Defendant supplied its commercial distributors with "blister pack version[s] of the dual-ended CAE," specifically "packed for retail stores."

44.    The part number and/or SKU of the device was 370-1011.

45.    Mr. Berger of 3M touted the Dual-Ended Combat Arms Earplug to civilians as "ideal for outdoor shooting and hunting" because the device provided "good protection" for "thousands of rounds fired at indoor reverberant ranges."

46.    Civilians and military personnel, including Plaintiffs, relied on Defendant's representations that the Dual-Ended Combat Arms Earplug is safe, effective, and provides two different options for adequate hearing attenuation and/or protection depending upon which end of the device is inserted into the user's ear.

47.    In addition to selling the Dual-Ended Combat Arms Earplug to civilians and the United States military, Defendant marketed, distributed, and sold the Dual-Ended Combat Arms Earplug commercially under different product names.

48.    For instance, among other products, Defendant's ARC earplug is structurally and technologically identical to the Dual-Ended Combat Arms Earplug.



49.    On October 21, 2015, Doug Moses of 3M acknowledged that there is no material "difference between Combat Arms and an ARC plug in terms of structure."

50.    In other words, as another 3M executive put it, "[t]he arc plug and dual end combat

arms plug are the same except for the colors used."

51.    Defendant initially marketed and sold the ARC earplug to civilians, such as electrical linemen, who frequently encountered potential noise hazards from electric arcs.

52.    Defendant then targeted the ARC earplug to a broader commercial market, ranging from "utilities business[es]" to "the food processing industry."

53.    Given this identical commercial product, Defendant did not design or develop the Dual-Ended Combat Arms Earplug for exclusive military use.

54.    Defendant designed and developed the Dual-Ended Combat Arms Earplug for a wide variety of users.

*Defendant's Testing of the Dual-Ended Combat Arms Earplug*

55.    Federal and industry regulations required Defendant to test the safety and efficacy of the Dual-Ended Combat Arms Earplug before distributing, supplying, and/or selling the device to consumers.

56.    Environmental Protection Agency ("EPA") regulations codified in 30 CFR 211.201 et seq., and the Noise Control Act, 42 U.S.C. § 4901 et seq., specifically regulate labeling and testing of hearing protection devices.

57.    Hearing protection devices are classified by their potential to reduce noise in decibels ("dB"), a term used to categorize the power or density of sound.

58.    Hearing protection devices must be tested pursuant to guidelines and procedures promulgated by the American National Standards Institute ("ANSI").

59.    These guidelines require manufacturers of hearing protection devices to test for and label their devices with a Noise Reduction Rating ("NRR").

60.    An NRR is a unit of measurement used to determine the effectiveness of hearing protection devices in decreasing sound exposure in certain environments.

61.     The noise measurement procedure published by ANSI, also known as ANSI S3.19-1974, governs the NRR labeling and testing of hearing protection devices.

62.     The higher the NRR number associated with a hearing protection device, the greater the potential for noise reduction in certain environments.

63.     The EPA requires manufacturers of hearing protection devices to provide accurate NRRs on the labels of their devices.

*Systemic Testing Bias*

64.     Instead of hiring an independent laboratory to test the NRRs of their hearing protection devices, Defendant regularly used its own EARCAL laboratory for that purpose since at least December 1999.

65.     The EARCAL laboratory is located in Indianapolis, Indiana.

66.     Unlike independent laboratories, the EARCAL laboratory used and uses inappropriate testing procedures that substantially skew the results of the NRR labeling tests that Defendant performed on its own hearing protection devices.

67.     Mr. Berger has managed the EARCAL laboratory since at least 1999.

68.     Mr. Berger testified at his October 8, 2015 deposition that instead of using randomized panels of test subjects, Defendant "preselects people to test out particular types of products," which ultimately "increase[s] the NRRs" of Defendant's hearing protection devices.

69.     EARCAL lab technician Ronald Kieper likewise testified at his October 9, 2015 deposition that Defendant only uses panels of individuals who are "able to consistently obtain [the] best fit on [a] particular type of hearing protector" and that limiting panels to such subjects in turn "raise[s] the NRR" of Defendant's hearing protection devices, including the Dual-Ended Combat Arms Earplug.

70.     Defendant has also used the so-called "Dixon Outlier Test" to exclude undesirable

data from labeling tests on its hearing protection devices.

71.    Mr. Hamer of 3M admitted at his October 7, 2015 deposition that Defendant's reliance on the Dixon Outlier Test is anathema to "statistical rules."

72.    In addition, Defendant's use of its own EARCAL laboratory allows the "biases" of its "lab guys" to go unchecked, unlike in an independent laboratory.

73.    As a result of Defendant's biases and improper testing procedures, Mr. Berger acknowledged at his October 8, 2015 deposition that Defendant previously received a "large fine" from the EPA for using "every legal trick in the book to get the highest NRRs possible" for its hearing protection devices.

74.    Specifically, on April 6, 1993, Defendant agreed to pay a $900,000 civil penalty to settle allegations that they had inaccurately labeled its single-ended foam earplugs as having a 35 NRR when in fact the NRR was only 29.

*January 2000 Testing*

75.    Despite this "six-figure fine" and ongoing concern that the EARCAL laboratory "could be setting Aearo up for another fine," Defendant continued using "every legal trick in the book" when testing the Dual-Ended Combat Arms Earplug.

76.    The EARCAL laboratory began testing the Dual-Ended Combat Arms Earplug in approximately December 1999 or January 2000.

77.    The first test of the Dual-Ended Combat Arms Earplug, which Defendant identified as "Test 213015," involved the closed, blocked, or linear end of the device.

78.    The next test of the Dual-Ended Combat Arms Earplug, which Defendant designated as "Test 213016," involved the open, unblocked, or non-linear end of the device.

79.    Defendant intended both of these tests to be NRR labeling tests.

80.    Mr. Berger admitted so at his October 8, 2015 deposition, averring that he believed

Test 213015 was a "labeling test" when Defendant started the test.

81.     Similarly, on October 9, 2015, Mr. Kieper testified at his deposition that "both of those [tests] were supposed to be labeling tests."

82.     Because Defendant intended Test 213015 and Test 213016 to be labeling tests, Defendant should not have terminated the tests prior to completion.

83.     Nor could Defendant sell a hearing protection device such as the Dual-Ended Combat Arms Earplug based on incomplete labeling testing.

84.     For example, Mr. Hamer testified at his October 7, 2015 deposition that Defendant could not stop a labeling test "if the product [did not] fit right."

85.     For each labeling test, Defendant selected ten subjects to test the Dual-Ended Combat Arms Earplug, many of whom were its own employees rather than randomly selected individuals from the general public.

86.     To determine the NRR of each end of the Dual-Ended Combat Arms Earplug, Defendant designed the labeling tests to capture: (1) each subject's hearing without an earplug; (2) each subject's hearing with the closed end of the Dual-Ended Combat Arms Earplug inserted according to standard procedures for proper use; and (3) each subject's hearing with the open end of the Dual-Ended Combat Arms Earplug inserted according to standard procedures for proper use.

87.     Defendant monitored the results of each subject during the testing.

88.     After testing only eight of the ten subjects in Test 213015, Defendant terminated the test of the closed end of the Dual-Ended Combat Arms Earplug.

89.     Mr. Berger told Mr. Kieper to terminate the test of the closed end of the device because the average NRR of the eight subjects was only 10.9.

90.     Mr. Hamer of 3M also testified at his October 7, 2015 deposition that a 10.9 NRR provided "insufficient" protection for civilians and military personnel.

91.     Even an NRR of 17, explained Mr. Hamer, would be too low and thus not a "desirable NRR" for the closed end of the Dual-Ended Combat Arms Earplug.

92.     Defendant's internal documents likewise acknowledge that a 17 NRR provides "low attenuation" and insufficient protection from harmful noises.

93.     After the aborted test, Defendant investigated the cause of the low NRR rating for the closed end of the Dual-Ended Combat Arms Earplug.

94.     Defendant determined that when users inserted the closed end of the Dual-Ended Combat Arms Earplug into their ears, the edge of the third flange of the open end of the earplug pressed against the users' ears and folded backward. When the inward pressure on the earplug was released, the folded flange on the open end pushed back into its original shape and caused the earplug to loosen imperceptibly.

95.     In fact, Mr. Kieper testified that when he fitted each subject with the closed end of the Dual-Ended Combat Arms Earplug according to standard instructions, "the flanges of the yellow [open] end would sometimes come into contact with their ear, and that would prevent [users from] getting the solid [closed] end in their ear deep enough to provide a seal."

96.     Mr. Kieper also emphasized that upon fitting the test subjects with the Dual-Ended Combat Arms Earplug, "[t]hey didn't realize it was coming out."

97.     Defendant therefore concluded that if used as designed and intended, the Dual-Ended Combat Arms Earplug would loosen imperceptibly and provide "insufficient" hearing protection.

98.     Such imperceptible loosening would in turn allow harmful sounds to move around the totality of the earplug instead of through it, thus entering the user's ear canal and damaging the user's hearing.

99.     Given the symmetrical nature of the product with regard to its flanges, Defendant knew in 2000 that the design of the Dual-Ended Combat Arms Earplug prevented a proper fit and seal

when inserting either end of the device into the user's ear canal according to standard fitting procedures.

100. Tellingly, when testing the open end of the Dual-Ended Combat Arms Earplug in Test 213016, Defendant obtained an NRR of -2.

101. An NRR of -2 indicated that the open end of the Dual-Ended Combat Arms Earplug actually amplified sound rather than attenuated sound, as intended.

102. Defendant knew "something went wrong" in Test 213016 given the negative NRR and "unusually high" standard deviations of the test results.

103. Defendant also knew that NRR "[v]alues less than 0 make no sense."

104. Unsurprisingly, then, Mr. Hamer testified that "the hearing protection device was perhaps not fitted correctly," and Mr. Kieper further testified that "the green flanges were causing the yellow end to come out of [the user's] ear."

105. Without informing Plaintiffs or the United States military, Defendant brazenly and perniciously inflated the -2 NRR to a 0 NRR.

106. Defendant has displayed the 0 NRR on the packaging of the Dual-Ended Combat Arms Earplug ever since they began supplying the device to civilians and military personnel.

107. Defendant has also continued to display the fabricated 0 NRR despite subsequent in-house and independent testing that generated significantly different NRRs for the open end of the device.

108. Worse, Defendant touted the obviously invalid 0 NRR as a benefit of the open end of the device, routinely representing that soldiers and civilians would be able to hear quiet, close-range conversation despite being protected from louder, harmful noises.

109. In reality, however, Defendant knew all the way back in 2000 about the Dual-Ended Combat Arms Earplug's dangerously defective design, which not only prevents users from obtaining

a proper fit and seal, but also causes the device to loosen imperceptibly regardless of which end of the device is inserted into the user's ear.

110. Ultimately, both ends of the Dual-Ended Combat Arms Earplug allow high-level and harmful sounds to move around the unsealed earplug and to enter the user's ear, causing hearing loss, tinnitus, and/or other hearing-related injuries.

*February 2000 Testing*

111. Defendant retested the closed end of the device beginning in February 2000.

112. Defendant identified this test as "Test 213017" and used a different panel of subjects than they used in Test 213015.

113. Defendant also used different insertion instructions than in Test 213015, contrary to the standard instructions that would be provided to civilians and military personnel.

114. Defendant conducted this retesting despite the fact that EARCAL laboratory policies and procedures did not allow retesting a hearing protection device by reconfiguring the device.

115. In Test 213017, Defendant folded back the yellow flanges of the open end of the earplug prior to inserting the closed end into each subject's ear.

116. This reconfigured fitting procedure ostensibly created a tighter fit and seal than the standard fitting procedure that Defendant had used in Test 213015.

117. As a result of Test 213017, Defendant learned in 2000 that when the flanges of the open end of the Dual-Ended Combat Arms Earplug were folded back prior to inserting the closed end of the earplug into the user's ear, the flanges of the open end neither touched the user's outer ear nor disturbed the seal of the earplug.

118. Using this reconfigured insertion procedure, Defendant obtained an NRR of 21, almost twice the NRR of 10.9 generated in Test 213015.

119.    Still unsatisfied, Defendant excluded the data of one subject and retested that subject in May 2000, further manipulating the results of Test 213017.

120.    Based on the additional retest of that subject and the modified fitting procedures used in Test 213017, Defendant increased the NRR to 22 on the closed end of the Dual-Ended Combat Arms Earplug, more than doubling the NRR compared to Test 213015, which used Defendant's standard fitting procedures.

121.    Defendant have displayed this manipulated 22 NRR on the packaging of the Dual-Ended Combat Arms Earplug ever since this device was first made available to civilian consumers and military personnel.

122.    Defendant have done so even though Test 213015 generated a 10.9 NRR and subsequent testing of the closed end of the device also yielded NRRs lower than 22.

123.    For example, a five-subject test in June 2005, which Defendant identified as Test 215508, yielded a 15 NRR.

124.    In addition, a three-subject test in April 2007, which Defendant identified as Test 215516, yielded a 14 NRR.

125.    Defendant, however, never warned civilians, military personnel, or the United States military that it obtained the 22 NRR by testing the Dual-Ended Combat Arms Earplug on an unrepresentative panel of subjects, that they manipulated the test data of those unrepresentative subjects, or that it reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects.

126.    Mr. Hamer testified at his October 7, 2015 deposition that Defendant's testing of the Dual-Ended Combat Arms Earplug "with the flange rolled back [was] improper."

127.    He also unequivocally admitted that "the labeling test that 3M's using for Combat Arms Version 2 for the green end is not the appropriate test."

128. In stark contrast to folding back the opposing flanges of the Dual-Ended Combat Arms Earplug when retesting the closed end of the device, Defendant did not retest the open end based on that reconfigured fitting procedure.

129. On multiple occasions, however, Defendant did retest the open end of the Dual-Ended Combat Arms Earplug using standard fitting procedures.

130. For instance, a ten-subject test in June 2004, which Defendant identified as Test 215009, yielded a -1 NRR for the open end of the Dual-Ended Combat Arms Earplug.

131. But Defendant once again scratched that invalid value and improperly labeled the open end of the Dual-Ended Combat Arms Earplug with a 0 NRR.

132. To make matters worse, Defendant continued to label the open end of the Dual-Ended Combat Arms Earplug with a 0 NRR despite subsequent testing generating positive NRRs.

133. For example, a five-subject test conducted in June 2005, which Defendant identified as Test 215507, yielded a 4 NRR.

134. Another five-subject test conducted in June 2005, which Defendant identified as Test 215511, yielded a 6 NRR.

135. Yet another five-subject test conducted in September 2005, which Defendant identified as Test 215515, yielded a 5 NRR.

136. And a ten-subject test conducted in April 2006, which Defendant identified as Test 215012, yielded a 5 NRR.

137. Faced with these conflicting NRRs, Defendant's internal documents admit that "[w]e are unsure of the correct [NRR] for the open end of the CAE Ver. 2 [and] that later [NRR] tests are the more appropriate."

138. Though Defendant's internal testing demonstrated that the Dual-Ended Combat Arms Earplug created "significantly more attenuation in the open position which should detract from

situational awareness," Defendant continued to label the device with a 0 NRR because "lower attenuation is more desirable" for the open end of the device.

139.    Indeed, Defendant told civilians and the United States military that the open end of the Dual-Ended Combat Arms Earplug enhanced "situational awareness" by allowing the user to hear low-level sounds between impulse noises.

140.    Ultimately, given Defendant's intentional manipulation and misrepresentation of the NRRs for both ends of the Dual-Ended Combat Arms Earplug, new employees who evaluated the internal testing of the device called the 22 NRR for the closed end and the 0 NRR for the open end an utter "mystery."

*Defendant's False Claims About the Dual-Ended Combat Arms Earplug*

141.    Following Defendant's deceptive and unlawful testing of the Dual-Ended Combat Arms Earplug, Defendant and/or their distributors sold the device commercially and then to the United States military beginning in or around 2003.

142.    Defendant and/or their distributors continued to sell the Dual-Ended Combat Arms Earplug to civilians and the United States military until at least November 2015, when Defendant discontinued the Dual-Ended Combat Arms Earplug.

143.    Defendant therefore sold the Dual-Ended Combat Arms Earplug commercially and to the military for over a decade, reaping millions of dollars in ill-gotten profits from selling this defective product each year it was on the market.

*Inaccurate Noise Reduction Ratings*

144.    From at least 2003 to 2015, Defendant inaccurately represented the NRRs of both the open end and closed end of the Dual-Ended Combat Arms Earplug.

145.    Specifically, Defendant falsely marketed, advertised, and promoted the closed end of the Dual-Ended Combat Arms Earplug to civilians and the United States military as a linear earplug

with a 22 NRR.

146.    However, Defendant's internal testing revealed that the NRR of the closed end of the Dual-Ended Combat Arms Earplug is only 10.9 when used according to the standard instructions for "proper use" that came with the device.

147.    Defendant also falsely marketed, advertised, and promoted the open end of the Dual-Ended Combat Arms Earplug to civilians and the United States military as providing adequate level-dependent hearing protection with a 0 NRR.

148.    However, Defendant's initial test revealed that the NRR of the open end of the Dual-Ended Combat Arms Earplug was -2, while later tests generated NRRs ranging from -1 to 6, leaving Defendant entirely "unsure" about the true NRR for the open end of the device.

149.    Defendant thus falsely represented that the Dual-Ended Combat Arms Earplug provided civilians and military personnel with two different hearing protection options for providing adequate hearing protection regardless of which end of the plug is used.

150.    This was one alleged benefit that Plaintiffs and the United States military relied on in purchasing and/or using the Dual-Ended Combat Arms Earplug.

*Inadequate Instructions and Warnings*

151.    Defendant also directly and/or indirectly supplied, sold, and/or distributed the Dual-Ended Combat Arms Earplug to civilians and military personnel without disclosing or warning about the defective design of the product.

152.    Defendant was aware no later than 2000 of the dangerously defective design of the Dual-Ended Combat Arms Earplug and that the device inadequately protected the hearing of civilian and military users such as Plaintiffs.

153.    Specifically, Defendant knew the Dual-Ended Combat Arms Earplug could loosen in the user's ear—imperceptible to not only the user but also audiologists visually observing the user—

thereby permitting damaging sounds to enter the user's ear through leaks in the seal between the user's ear and the earplug.

154.    Yet, Defendant did not adequately warn of the dangerous design defects of the Dual-Ended Combat Arms Earplug, despite their knowledge of the same.

155.    Defendant also did not adequately warn or instruct users, including Plaintiffs, how to wear and insert the Dual-Ended Combat Arms Earplug in order to achieve the NRR ratings that Defendant advertised and promoted over the years.

156.    Although Defendant issued standard instructions for "proper use" of the Dual-Ended Combat Arms Earplug, the instructions did not instruct all users to fold back the opposing flanges of the earplug before inserting the device into their ears.

157.    Defendant's standard instructions also did not warn users that the unrepresentative panel of ten subjects who tested the Dual-Ended Combat Arms Earplug in Test 213017 did not follow standard instructions for "proper use," but rather folded back the flanges of the opposite end of the earplug before inserting it into their ears.

158.    Nor did Defendant's standard instructions for "proper use" inform users that the Dual-Ended Combat Arms Earplug would not provide a 22 NRR if they did not fold back the opposing flanges on the open end of the device before inserting the closed end of the device into their ears.

159.    Instead, Defendant's standard instructions simply directed users, such as Plaintiffs, to insert the Dual-Ended Combat Arms Earplug into their ears.

160.    The instructions specifically stated: "INSERT the end you have selected into earcanal WHILE PULLING ear outward & upward with opposite hand. ADJUST until earplug feels securely seated in the earcanal."

161.    Thus, neither Plaintiffs nor the United States military knew that users had to fold back

the opposing flanges of the earplug in order to obtain a proper seal.

162. In fact, when asked whether he had "any documents showing that [he] told the Army that the instruction for the Combat Arms Version 2 should instruct [users] to roll back the flange," as in Test 213017, Mr. Berger of 3M testified "No."

163. Julie Bushman, who previously served as 3M's Senior Vice President of Business Transformation and Information Technology, similarly stated at her October 20, 2015 deposition that "[t]here's nothing in [the] instructions for use that mentions rolling back the flange."

164. Unlike Defendant's "single-sided" earplug, which is "[s]old in pillow packs w/instructions," Defendant's internal documents confirm that the "Dual-Ended" version at issue here is "[s]old in [b]ulk [p]ack (no individual instructions)."

165. Defendant knew that by failing to instruct Plaintiffs to fold back the flanges of the open end of the Dual-Ended Combat Arms Earplug before inserting the closed end, the earplug would not seal to Plaintiffs' ears, thereby allowing harmful noise to enter Plaintiffs' ears unimpeded by the closed end of the earplug.

166. Defendant also knew that by failing to instruct Plaintiffs to fold back the flanges of the closed end of the Dual-Ended Combat Arms Earplug before inserting the open end, the earplug would not seal to Plaintiffs' ears, thus allowing harmful noise to enter Plaintiffs' ears unimpeded by the open end of the earplug.

167. And by failing to instruct Plaintiffs to fold back the opposing flanges before inserting the closed end of the Dual-Ended Combat Arms Earplug into their ear, Defendant falsely overstated the amount of hearing protection supposedly provided by the closed end of the Dual-Ended Combat Arms Earplug.

168. Mr. Berger confirmed at his deposition that the 22 NRR only applied to the closed end of the Dual-Ended Combat Arms Earplug if the user folded back the opposing flanges of the open

end before inserting the closed end into the ear.

169.    When Defendant did not instruct users to fold back the flanges of the open end, Test 213015 revealed a 10.9 NRR for the closed end—less than half of the 22 NRR advertised on the label of the Dual-Ended Combat Arms Earplug.

170.    Mr. Berger also testified that Defendant "couldn't sell those plugs under the way they were being manufactured and fitted" because he and Mr. Kieper had terminated Test 213015, which Defendant had "intended to be a labeling test."

171.    In addition, by fabricating a 0 NRR for the open end of the Dual-Ended Combat Arms Earplug in the face of contradictory NRR data, Defendant intentionally misstated the amount of protection provided by that end of the device.

172.    Although the open end of the Dual-Ended Combat Arms Earplug provides little to no protection when used according to standard fitting procedures, Defendant represented to Plaintiffs and the United States military that the open mode "allow[s] situational awareness yet protect[s] against dangerous peak levels with a filter element that reacts instantaneously to provide increased protection."

173.    Defendant's labeling, packaging, and marketing of the Dual-Ended Combat Arms Earplug are thus misleading and have caused thousands upon thousands—if not millions—of innocent users to suffer hearing loss and tinnitus.

174.    Further, Defendant's testing, labeling, and marketing of the Dual-Ended Combat Arms Earplug violated EPA regulations, 40 CFR § 211.204-04 et seq., the Noise Control Act, 42 U.S.C. § 4901 et seq., and ANSI S3.19-1974.

175.    Given Defendant's improper and duplicitous testing, labeling, and marketing of the Dual-Ended Combat Arms Earplug, all known by Defendant prior to 2003, Mr. Berger of 3M declared at his October 8, 2015 deposition that "the instructions will be changed."

176.  Defendant discontinued the Dual-Ended Combat Arms Earplug on or about November 17, 2015, just a few weeks after Mr. Berger promised to change the instructions.

*Scientific Misrepresentations*

177.  In addition to sheltering the defects of the Dual-Ended Combat Arms Earplug, misrepresenting the NRR for both ends of the earplug, and failing to warn or provide proper instructions for using the earplug in civilian and military contexts, Defendant distorted scientific sources when marketing, advertising, and promoting the Dual-Ended Combat Arms Earplug to Plaintiffs and the United States military.

178.  Citing the 1998 Blast Overpressure Study by Daniel Johnson, for example, Defendant's marketing brochures declared that "[t]he level-dependent technology used in the [Dual-Ended Combat Arms Earplug] has been tested on human subjects and found to be protective at 190 dBP for at least 100 exposures (sufficient to cover the loudest weapons in the military inventory, including shoulder-fired rockets)."

179.  Given Defendant's gloss on the Johnson study, customers believed that the Dual-Ended Combat Arms Earplug was "protective at 190 dBP for at least 100 exposures" of the "loudest weapons in the military inventory."

180.  Although Defendant repeatedly cited the Johnson study from 2003 to 2015 when marketing, advertising, and promoting the Dual-Ended Combat Arms Earplug, the Johnson study does not actually show that the Dual-Ended Combat Arms Earplug is "protective at 190 dBP for at least 100 exposures."

181.  To the contrary, according to a Technical Service Specialist at 3M, the Dual-Ended Combat Arms Earplug does "not reduce 190 dB explosions to a safe level."

182.  In a July 9, 2014 email, Ted Madison of 3M informed Mr. Berger and other 3M employees that the Johnson "study only looked at whether the soldiers experienced temporary

threshold shifts (TTSs) after a few blasts. There is more and more evidence that damage to the ears can occur even when TTS does not occur."

183.    Mr. Berger echoed Mr. Madison's criticism in the same email chain, stating that the study "found for a limited number of blasts up to about 190 dB the plugs prevented temporary threshold shifts." However, "those were large weapons with much low[er] frequency content. For rifle shots that are more hazardous to the ear because of their high-frequency content[,] the protection will not be as great."

184.    Mr. Berger also said the Dual-Ended Combat Arms Earplug is "not the optimal choice for a gun range" and is "inadequate for indoor gun ranges," even though Defendant have advertised the Dual-Ended Combat Arms Earplug for use in indoor and outdoor gun ranges ever since they started selling the product.

185.    On February 9, 2010, moreover, Mr. Berger declared that "I know on past sheets we have claimed [that the Johnson study] found the plug protective for impulse noise up to 193 dBP," but there were "no tests allowed at 193" and "NOT ENOUGH SUBJECTS were exposed to provide a definitive answer."

186.    Mr. Berger concluded: "I am unconvinced that [the study] can support the statement that says [the Dual-Ended Combat Arms Earplug] 'has been tested on human subjects and found to be protective at 190 dBP for at least 100 exposures.'"

187.    At best, Berger said, "it might be reasonable to claim 6 exposures."

188.    Even though Defendant knew the 1998 Johnson study did not support its claim that the Dual-Ended Combat Arms Earplug was "protective at 190 dBP for at least 100 exposures," Defendant continued to knowingly market, advertise, and promote the product to the public based on that false statement.

189.    Defendant did so despite acknowledging in its public press releases that "[t]innitus,

often referred to as 'ringing in the ears,' and noise-induced hearing loss can be caused by a one-time exposure to hazardous impulse noise, or by repeated exposure to excessive noise over an extended period of time."

**Fraudulent Concealment**

190.    At all times material hereto, Defendant committed a continuing fraud in obfuscating and failing to disclose facts that were known to them relating to its fraudulent testing of the Dual-Ended Combat Arms Earplug and defective design of the product—facts that were not discovered and could not have been discovered by any person or Plaintiff undertaking reasonable due diligence.

191.    Plaintiffs did not and could not have discovered with reasonable diligence the veritable facts regarding Defendant's misrepresentations, omissions, faulty testing, and the defective design of the Dual-Ended Combat Arms Earplug.

192.    Nor could Plaintiffs have discovered that Defendant's Dual-Ended Combat Arms Earplug caused their hearing-related injuries and/or sequelae thereto because the earplug caused imperceptible loosening, as Defendant knew all along.

193.    Defendant is liable to Plaintiffs for its tortious acts.

**Defendant's Discontinuation of the Dual-Ended Combat Arms Earplug**

194.    Defendant discontinued the Dual-Ended Combat Arms Earplug on November 17, 2015.

195.    Although Defendant supplied the Dual-Ended Combat Arms Earplug to innocent civilians and military personnel for more than a decade, its discontinuation of this defective device had been a long time in the making.

196.    Defendant's internal testing in January 2000 revealed that the Dual-Ended Combat Arms Earplug was defectively designed and that the defective design caused the earplug to loosen imperceptibly in users' ears.

197.    Subsequent reports also made clear that "[a]lthough the Combat Arms Earplug (CAE) has been successful, there are a number of problems which need to be addressed which will result in changes and extensions to the line."

198.    Given the plethora of problems, Defendant changed the dual-ended design to a single-ended concept and created different sizing options in 2005.

199.    In 2013, however, Defendant acknowledged that the list of all potential improvements to the Dual-Ended Combat Arms Earplug had "gone unanswered."

200.    In fact, more than 15 years after Defendant learned of the design defect of the Dual-Ended Combat Arms Earplug, Defendant finally discontinued this unreasonably dangerous product and "recommend[ed] that purchasers interested in [the product] consider 3M Combat Arms Earplugs – Generation 4 as an alternative."

201.    The Generation 4 Combat Arms Earplug, unlike the discontinued, dangerous, and defective Dual-Ended Combat Arms Earplug, provides linear and non-linear protection through a single-ended earplug rather than a dual-ended one.

202.    The single-ended Generation 4 Combat Arms Earplug thus does not suffer from the same dangerous defects as the Dual-Ended Combat Arms Earplug.

203.    The single-ended design of the Generation 4 Combat Arms Earplug is also easier for users to insert into their ear canal and obtain a proper fit and seal.

204.    Approximately one month before Defendant discontinued the Dual-Ended Combat Arms Earplug, Mr. Berger testified that the Generation 4 Combat Arms Earplug "did not suffer from having a second set of flanges that interfered with grasping the plug well and being able to insert it properly."

205.    He also said that the Dual-Ended Combat Arms Earplug was "more difficult to fit because [users] don't have a stem or a rigid plastic part to hold onto."

206. Because users do not have to "hold onto flanges, whether they're rolled back or not rolled back," Mr. Berger explained that the Generation 4 Combat Arms Earplug as well as other single-ended earplugs manufactured by Defendant, including the traditional Ultrafit earplug, had an ergonomically "better design."

207. Indeed, none of Defendant's other pre-molded earplugs have rearward-facing flanges like the defective Dual-Ended Combat Arms Earplug.

208. Mr. Berger summarized some of these design defects in an internal email to 3M personnel, declaring that the Generation 4 Combat Arms Earplug is not only "easier to insert correctly for a good seal and consistent performance," but it is also "easier to operate since it does not require removal and reinsertion to change from the open/weapon's fire mode to the closed/constant protection mode."

209. What's more, unlike the "one-size-fits-all approach" of the Dual-Ended Combat Arms Earplug that users "had to cram in" their ears, the Generation 4 Combat Arms Earplug comes in three different sizes—small, medium, and large.

210. These different sizes allow users to obtain an effective seal, in contrast to the one-size-fits-all approach of the Dual-Ended Combat Arms Earplug.

211. Defendant recognized in 2011—at least four years before they discontinued the Dual-Ended Combat Arms Earplug—that using a multiple-sized earplug "raise[s] comfort levels substantially" and allows for an "effective seal."

212. Other documents reveal Defendant's decades-old knowledge that "[m]ore exact sizing not only ensures user comfort, but also a better fitting earplug that would not lose its seal or fall out of the ear."

213. Because the Generation 4 Combat Arms Earplug avoids these and other issues, Defendant believes it is safer and more effective than the Dual-Ended Combat Arms Earplug.

214.    Indeed, when testing the Generation 4 Combat Arms Earplug in its closed position per standard fitting procedures, Defendant measured a 23 NRR.

215.    The 23 NRR of the Generation 4 Combat Arms Earplug is more than double the 10.9 NRR of the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendant's standard procedures for "proper use."

216.    The 23 NRR of the Generation 4 Combat Arms Earplug is also higher than the 22 NRR of the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendant's reconfigured fitting procedures.

217.    Defendant thus concluded that the Generation 4 Combat Arms Earplug attenuates impulse and continuous noise better than the Dual-Ended Combat Arms Earplug.

218.    Even Defendant's "standard Ultrafit" earplug outperforms the closed end of the Dual-Ended Combat Arms Earplug when inserted according to Defendant's standard instructions or its reconfigured fitting procedure.

219.    In a confidential document dated December 12, 2010, Mr. Berger emphasized the "unexpectedly low values of mean attenuation" for the closed end of the Dual-Ended Combat Arms Earplug compared to the "standard Ultrafit."

220.    Thus, the development of the Generation 4 Combat Arms Earplug brought Defendant "closer and closer (through CAE evolution) to the right solution," but they only reached that solution after perpetrating a protracted fraud on thousands and perhaps millions of innocent civilians and military personnel.

221.    To make matters worse, this dangerously defective product has not been recalled and thus continues to injure innocent civilians and military personnel.

*Defendant's Attempt to Block a Competitor from Entering the Market*

222.    Besides fleecing civilians and the United States military into purchasing the

dangerously defective Dual-Ended Combat Arms Earplug, Defendant also attempted to block competitors from entering the earplugs market.

223. For example, one of Defendant's competitors is Moldex-Metric, Inc. ("Moldex")— a family-owned company located in Culver City, California.

224. Among other safety devices, Moldex manufactures a single-sided, non-linear, dual-mode earplug called BattlePlugs, which Moldex introduced to the market in approximately 2011.

225. At the time, Defendant held a virtual monopoly in the market for non- linear earplugs.

226. In order to prevent Moldex from selling BattlePlugs and competing in the earplugs market, 3M Defendant sued Moldex in the United States District Court for the District of Minnesota. *See 3M Co. v. Moldex-Metric, Inc.*, Case No. 12-611 (D. Minn.) ("*Moldex I*").

227. The lawsuit accused Moldex of infringing U.S. Patent No. 6,070,693 ("693 patent"), which Defendant had purchased and/or licensed from ISL and ultimately used to design and develop the Dual-Ended Combat Arms Earplug.

228. Upon notice of the lawsuit, Moldex immediately informed Defendant that BattlePlugs did not infringe the 693 patent under any legal theory.

229. Undeterred, Defendant stridently pursued its 693 patent claim against Moldex seeking injunctive relief in order to force Moldex out of the market.

230. After Moldex moved for summary judgment on the 693 patent claim, however, Defendant sent Moldex a covenant not to sue on both the 693 patent and BattlePlugs in order to preclude the district court from adjudicating the motion.

231. Defendant argued that the district court no longer had jurisdiction to hear its 693 patent claim or Moldex's dispositive motion of noninfringement.

232. Defendant then moved to dismiss its infringement claims regarding the 693 patent with prejudice and to dismiss Moldex's counterclaims of noninfringement and invalidity of the 693

patent without prejudice.

233.     On June 19, 2013, the district court dismissed with prejudice Defendant's claims against Moldex relating to the 693 patent.

234.     The district court also dismissed without prejudice Moldex's claim for a declaration that BattlePlugs did not infringe the 693 patent.

235.     Although Defendant ultimately abandoned its lawsuit, Moldex was forced to incur significant legal and other expenses in defending against Defendant's baseless and malicious patent infringement claim.

236.     In June 2014, Moldex filed an antitrust sham litigation and malicious prosecution action against Defendant, alleging that Defendant's prosecution of the 693 patent claim in *Moldex I* was objectively baseless as no reasonable litigant could have expected to succeed on the merits. *See Moldex Metric, Inc. v. 3M Co.*, Case No. 14-1821 (D. Minn.) ("*Moldex II*").

237.     Moldex also alleged that Defendant filed the 693 patent claim in order to drive Moldex out of the earplugs market.

238.     The district court denied Defendant's motion to dismiss Moldex's malicious prosecution claim on the ground that Moldex had shown "clear and convincing evidence" in support of its malicious prosecution claim.

239.     The district court then granted Moldex's motion for summary judgment on the objective baselessness of Defendant's 693 patent claim, holding that "[n]o reasonable litigant could realistically expect success on the merits of 3M's claim that Moldex Metric infringed the '693 Patent."

240.     In addition to filing and prosecuting a baseless patent infringement lawsuit against Moldex, Defendant used other predatory and nefarious conduct in attempting to force this family-owned company out of the earplugs market.

241.     For instance, Defendant falsely maligned Moldex's BattlePlugs in order to

persuade the United States military to purchase the Dual-Ended Combat Arms Earplug through the JWOD (Javits-Wagner-O'Day) federal program.

242.   And shortly after 3M filed its frivolous 693 patent infringement claim against Moldex, 3M lodged a spurious protest against a solicitation that the United States military had awarded to Moldex.

*Defendant's Settlement with the United States Government*

243.   On May 12, 2016, Moldex filed a sealed *qui tam* complaint against Defendant 3M under the False Claims Act, 31 U.S.C. § 3729 et seq. *See United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, Case No. 3:16-cv-01533 (D.S.C.).

244.   Moldex alleged, on behalf of the United States, that Defendant 3M sold the Dual-Ended Combat Arms Earplug to the "U.S. military for more than a decade without its knowledge of the defect."

245.   The United States intervened on July 25, 2018, in order to hold Defendant liable for its fraudulent conduct.

246.   One day later, Defendant agreed to pay $9.1 million to resolve the allegations that it knowingly sold the Dual-Ended Combat Arms Earplug to the United States military without ever disclosing the design defects that hampered the effectiveness of this unreasonably dangerous hearing protection device.

247.   As one government official put it: "3M should have told the US Government about the slippage issues" with the Dual-Ended Combat Arms Earplug.

## CAUSES OF ACTION

### COUNT I
### (Design Defect – Negligence)

248.   Plaintiffs restate the allegations above as if fully rewritten herein.

249. At all times relevant to this action, Defendant had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Dual-Ended Combat Arms Earplug with reasonable and due care for the safety and well-being of users, including Plaintiffs and other civilians and military personnel who used the device.

250. Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

251. Defendant knew civilians and military personnel such as Plaintiffs would use the Dual-Ended Combat Arms Earplug.

252. The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

253. When the Dual-Ended Combat Arms Earplug is inserted into the ear according to standard fitting instructions, a proper seal is not formed with the ear.

254. The defect has the same effect for both ends of the device because the earplug is symmetrical. In either scenario, the earplug may not maintain a tight fit and seal in some users like Plaintiffs, allowing dangerous sounds to bypass the earplug altogether and thus damage the user's hearing, unbeknownst to the user.

255. Defendant failed to exercise reasonable and due care under the circumstances and therefore breached its duty of care in the following ways:

a. Defendant failed to design the Dual-Ended Combat Arms Earplug in a manner that protected Plaintiffs from injury;

b. Defendant failed to design the Dual-Ended Combat Arms Earplug in a manner that provided linear and non-linear protection;

c.      Defendant failed to design the Dual-Ended Combat Arms Earplug in a manner that provided the amount of linear and non-linear protection as represented;

d.      Defendant misrepresented the NRRs of the Dual-Ended Combat Arms Earplug when used according to standard instructions;

e.      Defendant failed to test the Dual-Ended Combat Arms Earplug properly and thoroughly;

f.      Defendant failed to analyze the testing data of the Dual-Ended Combat Arms Earplug properly and thoroughly;

g.      Defendant claimed the Dual-Ended Combat Arms Earplug had benefits that it does not in fact have;

h.      Defendant designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug without adequately warning of the significant and dangerous risks of using the device;

i.      Defendant designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug without providing adequate or proper instructions to avoid foreseeable harm;

j.      Defendant designed, manufactured, distributed, and sold the Dual-Ended Combat Arms Earplug even though its risks and dangers outweighed any purported benefit of using the device;

k.      Defendant failed to fulfill the standard of care required of a reasonable and prudent manufacturer of hearing protection devices;

l.      Defendant continued to manufacture and distribute the Dual-Ended Combat Arms Earplug to civilians and the United States military after they knew or should have known of the device's adverse effects or the availability of safer designs;

m.      Defendant assumed the duty to warn of the defects and risks of the Dual-Ended

Combat Arms Earplug by providing instructions and information related to its benefits and effectiveness, but Defendant failed to provide adequate warnings and instructions; and

n.    Defendant provided inaccurate scientific and/or technical information when advertising, marketing, promoting, and supplying the Dual-Ended Combat Arms Earplug.

256.    Defendant knew or should have known that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous.

257.    The Dual-Ended Combat Arms Earplug was unreasonably dangerous when used by Plaintiffs, who followed the instructions provided by Defendant and used the earplug with common knowledge of its characteristics and according to its common usage.

258.    At the time the Dual-Ended Combat Arms Earplug left Defendant's possession, the device was in a condition that made it unreasonably dangerous to Plaintiffs.

259.    At the time Plaintiffs used the Dual-Ended Combat Arms Earplug, the device was in a condition that made it unreasonably dangerous to Plaintiffs.

260.    The Dual-Ended Combat Arms Earplug used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendant.

261.    At all relevant times, Plaintiffs used the Dual-Ended Combat Arms Earplug in the manner in which the device was intended to be used.

262.    As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of the Dual-Ended Combat Arms Earplug, Defendant had superior knowledge of the product and owed a duty of care to Plaintiffs.

263.    It was foreseeable that Defendant's misrepresentations, actions, and omissions would cause severe, permanent, and debilitating injuries to Plaintiffs.

264.    Defendant's conduct was a substantial factor in bringing about the injuries and/or

sequelae thereto sustained by Plaintiffs because Defendant designed, manufactured, tested, sold, and distributed the Dual-Ended Combat Arms Earplug used by Plaintiffs.

265.    As a direct and proximate result of Defendant's negligence, Plaintiffs suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

266.    As a direct and proximate result of Defendant's negligence, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

267.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT II
### (Design Defect – Strict Liability)

268.    Plaintiffs restate the allegations above as if fully rewritten herein.

269.    Defendant designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

270.    Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

271.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

272.    The Dual-Ended Combat Arms Earplug is also defective because it fails to contain adequate warnings of the significant risks of using the earplug, it fails to contain adequate or proper

instructions for use, and the risks and dangers of using the device outweigh any purported benefit.

273.    Defendant knew that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous to Plaintiffs.

274.    The Dual-Ended Combat Arms Earplug is dangerous when used by ordinary users such as Plaintiffs, who used the device as it was intended to be used.

275.    The Dual-Ended Combat Arms Earplug is dangerous to an extent beyond what would be contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear canal.

276.    At all relevant times, an economically and technologically feasible and safer alternative design existed for the Dual-Ended Combat Arms Earplug.

277.    At the time the Dual-Ended Combat Arms Earplug left Defendant's possession, the Dual-Ended Combat Arms Earplug was defective and in a condition that made the device unreasonably dangerous to Plaintiffs.

278.    At the time Plaintiffs used the Dual-Ended Combat Arms Earplug, the device was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

279.    The Dual-Ended Combat Arms Earplug used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendant.

280.    At all relevant times, Plaintiffs used the Dual-Ended Combat Arms Earplug in the manner in which the earplug was intended to be used.

281.    The Dual-Ended Combat Arms Earplug was the proximate cause of Plaintiffs' hearing loss and/or tinnitus because the design of the earplug allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk.

282.    Defendant's conduct was a substantial factor in bringing about Plaintiffs' injuries

and/or sequelae thereto because Defendant designed, tested, manufactured, sold, and distributed the Dual-Ended Combat Arms Earplug that caused those injuries and/or sequelae thereto.

283.    As a direct and proximate result of Defendant's defective design of the Dual-Ended Combat Arms Earplug, Plaintiffs' suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

284.    As a direct and proximate result of Defendant's defective design of the Dual-Ended Combat Arms Earplug, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

285.    Plaintiffs may also be required to obtain additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT III
### (Failure To Warn – Negligence)

286.    Plaintiffs restate the above allegations as if rewritten fully herein.

287.    At all times relevant to this action, Defendant had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Dual-Ended Combat Arms Earplug with reasonable and due care for the safety and well-being of Plaintiffs, who were subject to and used the product.

288.    Plaintiffs were foreseeable users of the product.

289.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes the earplug is working

as intended.

290.     Defendant breached its duty to Plaintiffs by failing to warn of the risks and dangers of using the Dual-Ended Combat Arms Earplug as intended.

291.     The Dual-Ended Combat Arms Earplug did not warn or instruct that it allows harmful sounds to bypass the earplug, thereby posing a serious risk.

292.     Defendant also breached its duty to Plaintiffs because they failed to warn or instruct that its testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

293.     Defendant also breached its duty to Plaintiffs because they failed to warn or instruct that following Defendant's standard instructions for insertion would not achieve a 22 NRR and would thereby pose a serious risk to Plaintiffs.

294.     Defendant further breached its duty to Plaintiffs because they failed to warn or instruct that they had not adequately or properly tested the Dual-Ended Combat Arms Earplug.

295.     The warnings and instructions of the Dual-Ended Combat Arms Earplug did not provide the amount of information that an ordinary consumer would expect when using the device in a reasonably foreseeable manner.

296.     Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the Dual-Ended Combat Arms Earplug, including but not limited to instructions directing them to fold back the opposing flanges of the device, Plaintiffs would have heeded such a warning or instruction.

297.     Defendant's failure to warn of the design defect or risks and dangers of the Dual-Ended Combat Arms Earplug proximately caused Plaintiffs' injuries and/or sequelae thereto.

298.     As a direct and proximate result of Defendant's failure to warn, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

299.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

300.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT IV**
**(Failure To Warn – Strict Liability)**

301.    Plaintiffs restate the allegations above as if fully rewritten herein.

302.    Defendant designed, manufactured, and sold the Dual-Ended Combat Arms Earplug.

303.    Plaintiffs were foreseeable users of the Dual-Ended Combat Arms Earplug.

304.    The Dual-Ended Combat Arms Earplug is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

305.    The Dual-Ended Combat Arms Earplug is defective and unreasonably dangerous even if Defendant exercised all proper care in the preparation and sale of the product.

306.    Defendant knew that the defective condition of the Dual-Ended Combat Arms Earplug made the device unreasonably dangerous to users such as Plaintiffs.

307.    The Dual-Ended Combat Arms Earplug is dangerous when used by an ordinary user who used the device as intended.

308. The Dual-Ended Combat Arms Earplug is dangerous to an extent beyond that contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear.

309. Defendant knew or should have known of the defective design of the Dual-Ended Combat Arms Earplug at the time they provided the device to Plaintiffs.

310. At the time the Dual-Ended Combat Arms Earplug left Defendant's possession, the earplug was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

311. At the time Plaintiffs used the Dual-Ended Combat Arms Earplug, the device was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

312. The Dual-Ended Combat Arms Earplug used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendant.

313. At all relevant times, Plaintiffs used the Dual-Ended Combat Arms Earplug in the manner in which the device was intended to be used.

314. The Dual-Ended Combat Arms Earplug is defective because Defendant failed to warn or instruct that the device allows dangerous sounds to bypass the earplug altogether, posing a serious risk to users.

315. The Dual-Ended Combat Arms Earplug is also defective because Defendant failed to warn or instruct that its testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

316. The Dual-Ended Combat Arms Earplug is also defective because Defendant failed to warn or instruct that following its standard instructions for insertion would not achieve a 22 NRR and would thus pose a serious risk to users.

317. The Dual-Ended Combat Arms Earplug is also defective because Defendant failed

to warn or instruct—or inadequately warned and instructed—that the device had not been adequately or properly tested.

318.    The warnings and instructions that accompanied the Dual-Ended Combat Arms Earplug failed to provide the level of information that an ordinary consumer, including Plaintiffs, would expect when using the product in a manner reasonably foreseeable to Defendant.

319.    Defendant had a post-sale duty to warn of the above alleged product-related defects and risks because Defendant knew or reasonably should have known that the Dual-Ended Combat Arms Earplug posed a substantial risk of harm to members of the military and civilians, including Plaintiffs; the Plaintiffs who used the Dual-Ended Combat Arms Earplug earplug can reasonably be assumed to be unaware of the risk of harm caused by the above-alleged defects because said defects were imperceptible; a warning or instruction showing how to correctly and safely use the Dual-Ended Combat Arms Earplug could have been effectively communicated to and acted upon by the Plaintiffs to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in members of the military and civilians, is sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

320.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the Dual-Ended Combat Arms Earplug, including but not limited to instructions to fold back the opposing flanges, Plaintiffs would have heeded the warning and/or instruction.

321.    The Dual-Ended Combat Arms Earplug proximately caused Plaintiffs' hearing loss and/or tinnitus because the device allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk to Plaintiffs.

322.    Defendant's conduct was a substantial factor in causing Plaintiffs' injuries and/or sequelae thereto because Defendant designed, tested, manufactured, sold, and distributed the Dual-

Ended Combat Arms Earplug that caused the hearing loss and/or tinnitus.

323.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

324.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

325.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V
### (Breach Of Express Warranty)

326.    Plaintiffs restate the allegations above as if fully rewritten herein.

327.    Through Defendant's public statements, descriptions, and promises relating to the Dual-Ended Combat Arms Earplug, Defendant expressly warranted that the product was safe and effective for its intended use and was designed to prevent harmful sounds from entering and thus damaging the user's hearing. Minn. Stat. Ann. § 336.2-313.

328.    These warranties came in one or more of the following forms:

    a.    publicly made written and verbal assurances of safety;

    b.    press releases, media dissemination, or uniform promotional information intended to create demand for the Dual-Ended Combat Arms Earplug, but which contained misrepresentations and failed to warn of the risks of using the product;

    c.    verbal assurances made by Defendant's consumer relations personnel about

the safety of the Dual-Ended Combat Arms Earplug, which also downplayed the risks associated with the product; and

        d.      false, misleading, and inadequate written information and packaging supplied by Defendant.

329.     When Defendant made these express warranties, it knew the intended purposes of the Dual-Ended Combat Arms Earplug and warranted the product to be in all respects safe and proper for such purposes.

330.     Defendant drafted the documents and/or made statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties.

331.     The Dual-Ended Combat Arms Earplug does not conform to Defendant's promises, descriptions, or affirmations, and is not adequately packaged, labeled, promoted, and/or fit for the ordinary purposes for which it was intended. Minn. Stat. Ann. § 336.2-313.

332.     All of the aforementioned written materials are known to Defendant and in its possession, and it is Plaintiffs' belief that these materials shall be produced by Defendant and made part of the record once discovery is completed.

333.     Plaintiffs are among the class of persons who can "reasonably be expected to use, consume or be affected by the [Dual-Ended Combat Arms Earplugs]." Minn. Stat. Ann. § 336.2-318.

334.     As a direct and proximate result of Defendant's breach of these warranties, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

335.     As a direct and proximate result of Defendant's breach of the express warranties, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

336.     Plaintiffs may also require additional medical and/or hospital care, attention, and

services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VI
### (Breach Of Implied Warranties)

337.    Plaintiffs restate the allegations above as if fully rewritten herein.

338.    At all times material to this action, Defendant was a merchant of the Dual-Ended Combat Arms Earplug.

339.    Plaintiffs are among the class of persons who can "reasonably be expected to use, consume or be affected by the [Dual-Ended Combat Arms Earplugs]." Minn. Stat. Ann. § 336.2-318.

340.    At the time Defendant marketed, sold, and distributed the Dual-Ended Combat Arms Earplug, Defendant knew of the intended use of the Dual-Ended Combat Arms Earplug, impliedly warranted the Dual-Ended Combat Arms Earplug to be fit for a particular purpose, and warranted that the Dual-Ended Combat Arms Earplug was of merchantable quality and effective for such use. Minn. Stat. Ann. § 336.2-315.

341.    Defendant knew or had reason to know that Plaintiffs would rely on Defendant's judgment and skill in providing the Dual-Ended Combat Arms Earplug for its intended use.

342.    Contrary to Defendant's implied warranties, the Dual-Ended Combat Arms Earplug is neither of merchantable quality, nor safe or effective for its intended use, because the device is unreasonably dangerous, defective, unfit, and ineffective for the ordinary purposes for which it is used.

343.    The Dual-Ended Combat Arms Earplug was sold without adequate instructions or warnings regarding the foreseeable risk of harm posed by the device.

344.    Defendant breached its implied warranties to Plaintiffs because the Dual-Ended Combat Arms Earplug was not adequately tested and was not of merchantable quality, safe, or fit for its foreseeable and reasonably intended use.

345.    Defendant's breach of its implied warranties violated numerous statutes, including but not limited to Minn. Stat. Ann. §§ 336.2-314 et seq.

346.    Plaintiffs could not have discovered that Defendant breached its warranties or the danger in using the Dual-Ended Combat Arms Earplug.

347.    As a direct and proximate result of Defendant's breach of implied warranties, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

348.    As a direct and proximate result of Defendant's breach of the implied warranties, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

349.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VII
### (Negligent Misrepresentation)

350.    Plaintiffs restate the allegations above as if fully rewritten herein.

351.    Defendant had a duty to tell Plaintiffs and the public the truth of the efficacy, risks, and harms associated with the Dual-Ended Combat Arms Earplug.

352.    Defendant breached its duty by falsely representing to Plaintiffs and the public that

the Dual-Ended Combat Arms Earplug had been properly tested and found to be effective when Defendant knew or should have known that the device is defective, had not been properly or adequately tested, and that Defendant had manipulated the test results.

353.    Defendant also breached its duty by falsely representing to Plaintiffs and the public that the instructions for use of the Dual-Ended Combat Arms Earplug were proper and adequate and would result in the advertised NRR when Defendant knew or should have known these statements were false.

354.    Defendant was in fact aware that it unlawfully manipulated the testing of the Dual-Ended Combat Arms Earplug and that its instructions were inadequate and improper.

355.    Defendant failed to exercise ordinary care in the representation of the Dual-Ended Combat Arms Earplug during its manufacturing, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendant negligently misrepresented the safety and efficacy of the device.

356.    In reliance upon these representations, Plaintiffs were in fact induced to and did use the Dual-Ended Combat Arms Earplug, thereby sustaining injuries and/or sequelae thereto.

357.    As a result of these misrepresentations and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

358.    As a direct and proximate result of these misrepresentations, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

359.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court

deems equitable and just.

## COUNT VIII
### (Fraudulent Misrepresentation)

360. Plaintiffs restate the allegations above as if fully rewritten herein.

361. Defendant falsely and fraudulently represented to Plaintiffs and the public that the Dual-Ended Combat Arms Earplug had been properly tested, was free from all defects, and contained adequate warnings and instructions.

362. Defendant also falsely and fraudulently represented to Plaintiffs and the public that the Dual-Ended Combat Arms Earplug functioned properly and promoted the closed end as having a 22 NRR and the open end having a 0 NRR.

363. Defendant also manipulated testing of the Dual-Ended Combat Arms Earplug, resulting in false and misleading NRRs and improper fitting instructions.

364. Defendant therefore knew that the Dual-Ended Combat Arms Earplug could and would injure Plaintiffs.

365. When Defendant made these representations, it knew its claims were false, and it willfully, wantonly, and recklessly disregarded the truth.

366. Defendant made these false representations with the intent of defrauding Plaintiffs and the public, and with the intent of inducing Plaintiffs and the public to recommend, purchase, and/or use the Dual-Ended Combat Arms Earplug, all of which demonstrate a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiffs.

367. At the time Defendant made the foregoing representations, and at the time Plaintiffs used the Dual-Ended Combat Arms Earplug, Plaintiffs did not know of the falsity of the representations and reasonably believed them to be true.

368. In reliance upon these representations, Plaintiffs were in fact induced to and did use

the Dual-Ended Combat Arms Earplug, thereby sustaining injuries and/or sequelae thereto.

369.    As a result of the foregoing acts and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

370.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

371.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IX
### (Fraudulent Concealment)

372.    Plaintiffs restate the allegations above as if fully rewritten herein.

373.    At all times relevant, Defendant misrepresented the safety and efficacy of the Dual-Ended Combat Arms Earplug for its intended use.

374.    Defendant knew or was reckless in not knowing that its representations were false.

375.    In its representations to Plaintiffs, Defendant fraudulently concealed and intentionally omitted the following material information:

    a.    the flawed and deliberately manipulated testing of the Dual-Ended Combat Arms Earplug;

    b.    the inadequate amount of hearing protection provided by the Dual-Ended Combat Arms Earplug;

c.     the inadequacy of the standard instructions for proper use of the Dual-Ended Combat Arms Earplug;

d.     the defective, improper, negligent, fraudulent, and dangerous design of the Dual-Ended Combat Arms Earplug; and

e.     the dangerous effects of the Dual-Ended Combat Arms Earplug.

376.   Defendant had a duty to disclose the foregoing issues to Plaintiffs.

377.   Defendant had sole access to the material facts concerning the defective nature of the product and its propensity to cause dangerous injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

378.   Defendant's concealment of information regarding the safety and efficacy of the Dual-Ended Combat Arms Earplug was willful, wanton, and/or reckless and was intended to mislead Plaintiffs into using the product.

379.   Defendant knew that Plaintiffs could not determine the truth of this information.

380.   Plaintiffs reasonably relied on facts revealed, which negligently, fraudulently, and/or purposefully did not include facts that Defendant concealed.

381.   As a direct and proximate result of the foregoing concealments and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

382.   As a direct and proximate result of the foregoing concealments and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

383.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory

damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT X
### (Fraud and Deceit)

384.    Plaintiffs restate the allegations above as if fully rewritten herein.

385.    Defendant conducted unlawful and improper testing on the Dual-Ended Combat Arms Earplug.

386.    As a result of this unlawful and improper testing, Defendant blatantly and intentionally omitted certain test results and distributed false information that misrepresented the amount of hearing protection provided by the Dual-Ended Combat Arms Earplug.

387.    Defendant had a duty when disseminating information to disclose truthful information and a parallel duty not to deceive the public and Plaintiffs.

388.    The information that Defendant distributed to Plaintiffs contained false and misleading material representations and/or omissions concerning the safety and efficacy of the Dual-Ended Combat Arms Earplug.

389.    Upon information and belief, Defendant intentionally suppressed and/or manipulated test results to misrepresent the amount of hearing protection provided by the Dual-Ended Combat Arms Earplug.

390.    In making these misrepresentations, Defendant intended to deceive and defraud the public and Plaintiffs, to gain the confidence of the public and Plaintiffs, and to induce the public and Plaintiffs to purchase, request, dispense, recommend, and/or continue using the Dual-Ended Combat Arms Earplug.

391.    Defendant also made the foregoing false claims and false representations with the intent of convincing the public and Plaintiffs that the Dual-Ended Combat Arms Earplug is effective

and safe for use.

392.    These representations and the others alleged herein were false when made, and/or made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard for the truth.

393.    Defendant intended these false representations to deceive and defraud Plaintiffs, to induce Plaintiffs to rely upon them, and to cause Plaintiffs to purchase, use, and/or rely on the Dual-Ended Combat Arms Earplug.

394.    Defendant recklessly and intentionally misrepresented the efficacy and safety of the Dual-Ended Combat Arms Earplug to the public and Plaintiffs for the specific purpose of influencing the marketing of a product that only Defendant knew was dangerous and defective or not as safe as other alternatives.

395.    Defendant willfully and intentionally failed to disclose material facts regarding the dangers and safety concerns of the Dual-Ended Combat Arms Earplug by concealing and suppressing material facts regarding such information.

396.    Defendant willfully and intentionally failed to disclose material facts and made false representations in order to deceive and lull Plaintiffs into purchasing, using, and/or relying on the Dual-Ended Combat Arms Earplug.

397.    Plaintiffs did in fact rely on and believe Defendant's representations to be true at the time Defendant made the representations.

398.    Plaintiffs were thus induced to purchase, use, and/or rely on the Dual-Ended Combat Arms Earplug based on Defendant's false representations.

399.    At the time Defendant made these representations, Plaintiffs did not know about any safety concerns regarding the Dual-Ended Combat Arms Earplug.

400.    Plaintiffs did not discover the true facts regarding Defendant's false representations;

nor could Plaintiffs have done so with reasonable diligence.

401.    Had Plaintiffs known the true facts, they would not have purchased, used, and/or relied on the Dual-Ended Combat Arms Earplug.

402.    Defendant's conduct constitutes fraud and deceit and was committed and/or perpetrated willfully, wantonly, and/or purposefully on Plaintiffs.

403.    As a result of the foregoing acts and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

404.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

405.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XI
### (Negligence Per Se)

406.    Plaintiffs restate the allegations above as if fully rewritten herein.

407.    At all times, Defendant had an obligation to comply with applicable statutes and regulations, including the Noise Control Act and implementing regulations, in the labeling and testing of the Dual-Ended Combat Arms Earplug.

408.    Defendant's actions as described herein violated applicable statutes and regulations, including but not limited to 42 U.S.C. § 4901 et seq., and 40 C.F.R.

§ 211.201 et seq., which regulate hearing protection devices such as the Dual-Ended Combat

Arms Earplug, as well as NRR labeling and testing of such devices.

409. Specifically, Defendant violated 42 U.S.C. § 4907 and 40 C.F.R. §§ 211.104, 211.210, and 211.211 by mislabeling the Dual-Ended Combat Arms Earplug, misrepresenting the NRR on the label of the device, and/or by failing to include proper fitting instructions to achieve the NRR stated on the label of the device.

410. Defendant did not follow the "[m]ethods for measurement of sound attenuation" stated in 40 C.F.R. § 211.206 and as required by ANSI S3.19-1974.

411. Defendant violated 40 C.F.R. § 211.207 by failing to properly calculate the NRR of the Dual-Ended Combat Arms Earplug.

412. Plaintiffs are within the class of persons that these statutes and regulations are intended to protect.

413. Plaintiffs' injuries and/or symptoms are the type of harm that these statutes and regulations are intended to prevent.

414. Defendant's violations of the foregoing statutes and regulations, among others, constitutes negligence per se.

415. As a direct and proximate result of Defendant's statutory and regulatory violations, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

416. As a direct and proximate result of Defendant's statutory and regulatory violations, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

417. Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory

damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XII
### (Loss of Consortium)

418.    Plaintiffs restate the allegations above as if fully rewritten herein.

419.    At all relevant times, certain Plaintiffs were married to spouses.

420.    As a result of the injuries and damages sustained by certain Plaintiffs, their spouses have suffered the loss of care, comfort, society, and affection from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XIII
### (Unjust Enrichment)

421.    Plaintiffs restate the allegations above as if fully rewritten herein.

422.    Defendant has received substantial revenues from sales of the defective Dual-Ended Combat Arms Earplug.

423.    Defendant is not entitled to the receipt of such revenues because the Dual-Ended Combat Arms Earplugs it sold were defective.

424.    It is unjust to allow Defendant to earn revenues and retain the benefits and profits from the Dual-Ended Combat Arms Earplug while Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing loss and/or tinnitus.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425.    Through the exercise of reasonable diligence, Plaintiffs did not and could not have discovered that the Dual-Ended Combat Arms Earplug caused their injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiffs.

426.    Plaintiffs did not suspect and had no reason to suspect that the Dual-Ended Combat Arms Earplug caused their injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427.    In addition, Defendant's fraudulent concealment has tolled the running of any statute of limitations.

428.    Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the risks associated with the defects of the Dual-Ended Combat Arms Earplug and that the device caused their injuries and/or sequelae thereto.

429.    Through its ongoing affirmative misrepresentations and omissions, Defendant committed continual tortious and fraudulent acts.

430.    As a result of Defendant's fraudulent concealment, Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendant's acts and omissions.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, each Plaintiff respectfully requests:

i.    That process issue according to law;

ii.    That Defendant be duly served and cited to appear and answer herein, and that after due proceedings are had, that there be judgment in favor of Plaintiffs and against Defendant for the

damages set forth below, in excess of $50,000, along with court costs and pre-judgment and post-judgment interest at the legal rate;

iii.  Pain and suffering (past and future);

iv.  Wage loss (past and future);

v.  Loss of earnings and loss of earning capacity;

vi.  Medical expenses (past and future);

vii.  Loss of enjoyment of life (past and future);

viii.  Mental anguish and distress (past and future);

ix.  Disfigurement (past and future);

x.  Physical impairment (past and future);

xi.  Costs and expenses incurred in this litigation, including but not limited to expert fees and reasonable attorneys' fees;

xii.  Any and all applicable statutory and civil penalties, as allowed by law;

xiii.  Pre- and post-judgment interest on any amounts awarded, as allowed by law; and

xiv.  Any such other and further relief as may be available at law or equity as the Court deems just and proper.

Date: January 25, 2023

By: /s/ Jason B. Wolf
Jason B. Wolf, Minnesota Lawyer ID. 0388737
**PARAFINCZUK WOLF, P.A.**
5550 Glades Road, Suite 500
Boca Raton, FL 33431
Telephone: (954) 462-6700
Fax: (954) 462-6567
jwolf@parawolf.com

Attorneys for Plaintiffs